1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                             HOUSTON DIVISION

3

UNITED STATES OF AMERICA        )
4                               )
v.                              )        NO. H-15-CR-515
5                               )
DANIEL NATHAN WEST              )        March 12, 2018
6

7

8

                                     SENTENCING
9               BEFORE THE HONORABLE KENNETH M. HOYT

10

11

12

13

14   For the Government:         Vernon Lewis, AUSA
                                 U. S. Attorney's Office
15                               1000 Louisiana, Suite 2300
                                 Houston, TX 77002
16
     For the Defendant:          Ali R. Fazel
17                               Fazel Law
                                 4801 Woodway Drive
18                               Suite 165-E
                                 Houston, TX 77056
19
     Court Reporter:             Bruce Slavin, RPR, CMR
20

21

22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.

1          THE COURT:  Cause No. 2015-515, the United States

2     of America v. Daniel Nathan West.

3              Representing the United States in this matter?

4          MR. LEWIS:  Vernon Lewis, Your Honor.  Good

10:58  5     morning.

6          THE COURT:  And representing Mr. West?

7          MR. FAZEL:  Ali Fazel, Your Honor.  Good afternoon,

8     Your Honor.

9          THE COURT:  Good afternoon, sir -- Well, actually,

10:58  10    it's "good morning".  I am following your lawyer's

11    statement.  I should not do that.  We still have -- I mean,

12    he must be on some other time zone.  Even with the change of

13    time, we still have an hour left today, in time, an hour

14    left before noon.

10:58  15              How are you doing, sir, and what is your name?

16         THE DEFENDANT:  Daniel Nathan West.

17         THE COURT:  Mr. West, you were before the Court

18    previously and entered a plea of "guilty"; did you not?

19         THE DEFENDANT:  Yes.

10:58  20         THE COURT:  Do you recall what your plea of

21    "guilty" -- what the charge was?

22         THE DEFENDANT:  One count of wire fraud.

23         THE COURT:  All right.  And this arises out of a

24    circumstance, an entanglement, where you were charged in a

10:59  25    multiple-count indictment with various and sundry charges of

1    wire fraud.  And I'm not sure if that totally completes all

2    that the indictment said, but, certainly, there were any

3    number of claims of wire fraud brought against you by the

4    United States in this case.  Correct?

10:59    5              THE DEFENDANT:  Yes.

6              THE COURT:  What is the status of the indictment

7    out of Georgia at this time?  Do you know?

8              MR. FAZEL:  May I address the Court on that?

9              THE COURT:  Is it still pending?

10:59    10             MR. FAZEL:  It is, Your Honor.

11             THE COURT:  Okay.

12             MR. FAZEL:  Mr. Adam Hames -- that's H-a-m-e-s --

13    he's a practicing lawyer in Georgia.  He also practices in

14    federal court in Georgia.  He's licensed and in good

10:59    15    standing.  With the Court's permission, he's sitting at

16    sidebar.  He is here and available.  He is representing

17    Mr. West on that proceeding.

18             THE COURT:  I don't have an interest in involving

19    myself in it.  I just wanted to make sure that -- were there

10:59    20    a sentence imposed already in that case, I wanted to

21    determine, in my own mind, what the impact, if any, would be

22    in this particular case.

23                  And what I understand from what you're saying

24    is that no sentence has been imposed, the matter is still

11:00    25    pending and the court is "free" -- I guess, might be a

1    word -- to proceed to sentencing in this case in the manner

2    that it chooses.  All right.

3              MR. FAZEL:  Yes, Your Honor.

4              MR. LEWIS:  Very briefly, Your Honor, on that

11:00   5    issue.

6              THE COURT:  Sure.

7              MR. LEWIS:  There are, actually, two indictments

8    pending in the state of Georgia.  I have spoken with the

9    prosecutor in those cases.  They're waiting for this case to

11:00   10   be resolved before they move forward.  That's what I have

11   been told.

12             THE COURT:  Yeah.  I suspected that would be the

13   case.  And I do have copies of both indictments.  I believe

14   probation might have supplied those to me.

11:00   15             All right.  This plea was pursuant to a plea

16   agreement entered into by yourself, Mr. West, along with the

17   prosecutor in this case or, should I say, the United States

18   in this case.  Correct?

19             THE DEFENDANT:  Yes, Your Honor.

11:00   20             THE COURT:  And I believe this goes back to

21   September of 2016, just under -- thereabouts, 18 months,

22   since the plea was entered at that time.

23             September 15, 2016, you entered a plea of

24   "guilty" to the charge of wire fraud.  And at that time

11:01   25   there was a -- I believe, may have been a stipulation as it

 1   relates to -- maybe it wasn't, but let me just make sure.

 2           Mr. Lewis, was there a stipulation as relates

 3   to the forfeiture loss that was incurred by the Defendant or

 4   that the government was agreeing to as a result of

 5   the Defendant's conduct?

 6           MR. LEWIS:  Yes, Your Honor.  That is correct.

 7           THE COURT:  And do you recall what that stipulation

 8   was or is?

 9           MR. LEWIS:  I can read it from the plea agreement,

10   Your Honor.

11           THE COURT:  All right.

12           MR. LEWIS:  Referring to Page 13 of the plea

13   agreement, Paragraph 23, Your Honor, the Defendant and the

14   United States stipulated and agreed that the factual basis

15   for his guilty plea supports a forfeiture of at least

16   $3,616,563.45 against the Defendant and in favor of the

17   United States.

18           THE COURT:  All right.  And that forfeiture

19   stipulation is now the subject of some -- not necessarily

20   dispute but some proffer or statements that I gather the

21   government, as well as the defense, chooses or has chosen to

22   provide to the Court.

23           So, let me ask whether or not you all agree on

24   what that adjustment ought to be.  Do you all agree with

25   each other on that?

1          MR. LEWIS:  I don't think we do.  I think we agree

2     in part but not as to the final number.

3          THE COURT:  All right.  So, we'll hear what your

4     differences are.

11:03  5               And for the benefit of the record Mr. Factor,

6     I believe his name is -- Is that correct?

7          MR. LEWIS:  Yes, Your Honor.

8          THE COURT:  Is he here in the courtroom?

9          MR. LEWIS:  He is, Your Honor.

11:03  10         THE COURT:  Mr. Factor has provided to probation

11    and maybe the government what we will refer to as a "victim

12    impact statement" indicating, I gather, what he would

13    describe as the factual basis and scenario surrounding the

14    fraudulent scheme or schemes, as well as what he determines

11:04  15    in his own search and determinations to be the appropriate

16    forfeiture.  And I think he goes beyond that, however, and

17    determines that there is another number that the Court, I

18    gather, should think about, and that is the project

19    opportunity losses, which I cannot.

11:04  20         MR. FAZEL:  Correct.

21         THE COURT:  But the point is that that's what, I

22    gather, the civil lawsuit is about.

23         MR. LEWIS:  Yes, Your Honor.

24         THE COURT:  And that remains pending at this time.

11:04  25         MR. LEWIS:  Yes, Your Honor.  And, as the Court has

observed, Mr. Factor is the owner and CEO of the victim

corporation Airis International, and he is here at the

Court's discretion and willing to speak and available to

speak to talk about the impact on the corporation.  The

11:05  Court, of course, has the --

THE COURT:  I am going to put you on the spot and

ask you and then we'll come back to you as well on this.

MR. FAZEL:  Yes, Your Honor.

THE COURT:  But I am going to put you on the spot

11:05  and ask you whether or not probation's determination of the

loss, actual dollar loss, is consistent or close or

inconsistent, substantially, with what Mr. -- what the Airis

company would claim is its actual loss.  Do you know?  I

don't know if you know that; so, I am putting you on the

11:05  spot.

MR. LEWIS:  Probation's calculation is correct,

Your Honor.

THE COURT:  Okay.  So, is that a number -- except

for the fact that there is a claim of damages which exceeds

11:05  what actual losses might have occurred and other contractual

obligations that the Plaintiff Airis might make or

Mr. Factor might make in his lawsuit -- beyond that, is

Mr. Factor and Airis disputing that number?

MR. LEWIS:  No, Your Honor.

11:06  THE COURT:  Okay.  So, that would mean -- it means,

1    in part, that I can now turn to you, Mr. Fazel, and ask you.

2              As relates to your claim of credits --

3              MR. FAZEL:  Yes, Your Honor.

4              THE COURT:  -- there are at least three areas, I

11:06   5    believe, of credits that the government, let's say, concedes

6    with or -- I don't want to say "agree", but they concede

7    that you're entitled to those credits.  And I believe

8    probation has also acknowledged that and has applied those

9    credits.  Are those credits that are applied in order?

11:06   10             MR. FAZEL:  If it pleases the Court.  There are two

11   that the probation has conceded to, one that the government

12   has conceded to but probation has not, and that is on Page 5

13   of my objections for 31,231 --

14             THE COURT:  Hold on just one second.  Let me get

11:06   15   there because I didn't have your objections handy.  I was

16   kind of going through my thoughts.

17             What page are you on as referring to your

18   objections?

19             MR. FAZEL:  Page 5 of the objections, Your Honor.

11:07   20             THE COURT:  Page 5.  You're looking at item what?

21             MR. FAZEL:  "D".

22             THE COURT:  I'm sorry?

23             MR. FAZEL:  "D" as in "dog".

24             THE COURT:  "D".

11:07   25             MR. FAZEL:  Yes, sir.

1          THE COURT:  That's the 31,231.16 number?

2          MR. FAZEL:  Correct.

3          THE COURT:  That's a number that probation does not

4    concede?

11:07   5          MR. FAZEL:  I believe that's correct, Your Honor.

6          THE COURT:  It is a number that the government does

7    concede?

8          MR. FAZEL:  Correct.

9          THE COURT:  And I want to know the difference

11:07  10    between the government and probation there.

11              Beyond that, there are two other, I believe --

12    two or three other credits that you believe should be made

13    that are not made.  So, would you tell me what those others

14    are by letter, if you could.

11:07  15          MR. FAZEL:  Yes, Your Honor.  If it pleases the

16    Court, Page 4 of the objections addresses the first one.

17          THE COURT:  That would be "A"?

18          MR. FAZEL:  That would be "A".  Correct, Your

19    Honor.

11:07  20          THE COURT:  That's not conceded by the government

21    or probation?

22          MR. FAZEL:  Correct.  That would be for work that

23    is undertaken and monies that are owed Westtree, which is

24    the company that Mr. Nathan West owed.

11:08  25              During the life -- I guess just to back up a

 1    little bit, at some point in time -- and these are in my

 2    objections, these facts -- Westtree was created and was part

 3    and parcel of working with, if you will, the Airis

 4    Corporation; and Westtree provided services for the Airis

11:08    5    Corporation, including paying checks, paying --

 6           THE COURT:  So, this was time expended, and whether

 7    it's Mr. West's time or time by the employees, that he would

 8    claim should be reimbursed or, at least, applied to his

 9    account?

11:08   10           MR. FAZEL:  Correct.

 11           THE COURT:  Let's go to the next one, then.

 12           MR. FAZEL:  And the next one would be -- that one

 13    is the 26,197, "B" as in "boy" in objections.  That's

 14    Page 4.

11:08   15           That is -- And the Court is well aware of

 16    this.  When there is companies that are offshooting another

 17    company or a company that sells or purchases another

 18    company --

 19           THE COURT:  Right.

11:09   20           MR. FAZEL:  -- working closely together, especially

 21    in this situation where Westtree was basically an entity

 22    that existed in Atlanta and was part and parcel of Airis

 23    before it separated, there is equipment and so forth that

 24    shows, accounting-wise, as being provided to Westtree.

11:09   25    However, even though, in accounting nomenclature, the ledger

1    shows monies owed to Airis because equipment was given to

2    Westtree and, therefore, Westtree should pay Airis back that

3    money, this was just an accounting-type undertaking.

4              I think the understanding is that nobody would

11:09   5    pay $26,000 for older equipment, especially one that has

6    been -- As you know, in accounting --

7              THE COURT:  It depends on which side of the ledger

8    you're working.

9              MR. FAZEL:  That's absolutely correct.

11:09   10    THE COURT:  You could put that number down if

11    you're going to write it off again.

12             MR. FAZEL:  I guess the point is the equipment in

13    that situation, as you were mentioning, it would have been

14    depreciated by that time --

11:10   15    THE COURT:  But that depreciation is not the

16    Defendant's depreciation.  That depreciation belonged to

17    Airis.

18             MR. FAZEL:  Correct.

19             THE COURT:  And now that, theoretically, these same

11:10   20   assets are in the possession of Westtree, they now are the

21    assets of Westtree, and Westtree can put them on the book

22    and so did your client put them on the books as he chose to.

23             MR. FAZEL:  Correct.

24             THE COURT:  He's the accountant --

11:10   25    MR. FAZEL:  Correct.

 1          THE COURT:  -- on both sides of the ledger.

 2          MR. FAZEL:  Yes, sir.

 3          THE COURT:  So, we're talking about 26,000 dollars'

 4   worth -- You're talking about equipment and supplies or just

11:10   5   like computers and things?

 6          MR. FAZEL:  Computers and phones and desks and

 7   such.

 8          THE COURT:  Okay.  I got that.  What else?

 9          MR. FAZEL:  Number "C" has been agreed to by both

11:10  10   the government and probation.

11          THE COURT:  We talked about "D".

12          MR. FAZEL:  We talked about "D".

13           Number "E" -- excuse me -- letter "E" has been

14   agreed to by the government and probation.

11:11  15          THE COURT:  All right.

16          MR. FAZEL:  "F" is -- there is something called the

17   Westtree calculation report or "WIC" that was part of the

18   discovery process in this case.

19           The numbers that were used in order to come up

11:11  20   with the 3.6-million-dollar loss included looking at that

21   report and general ledgers of the companies to determine how

22   much money was transferred back and forth.  There's a lot of

23   transfers, Your Honor, going back and forth between the

24   companies.  A lot.  And, so, it was quite a bit of an effort

11:11  25   to figure out what transfer went where.

1          THE COURT:  We're talking about monetary transfers?

2          MR. FAZEL:  Correct.

3          THE COURT:  Cash?

4          MR. FAZEL:  Monies --

11:11    5          THE COURT:  Or instruments of cash.

6          MR. FAZEL:  Correct, being moved back and forth

7    for many purposes -- paying billings and so forth.

8              In those reports it indicates that there is an

9    amount of $1.1 million in one of the ledgers.  The other one

11:12   10   shows 1.095.

11             And, so, the 25,787.42 -- it shows the Court

12   that there is a discrepancy between what one document

13   indicates ought to be -- which is WIC, which is the West

14   Interest Calculation Report used by the government -- and

11:12   15   the general ledger of Airis.

16         THE COURT:  All right.  And which of these is

17   Westtree's?

18         MR. FAZEL:  Neither.  WIC was created -- I believe

19   was used by the government and created by one of the

11:12   20   employees of Westtree in consultation and cooperation with

21   the government.  The Airis ledger is created by the

22   accounting firm.

23         THE COURT:  Which is Airis' number?

24         MR. FAZEL:  Airis' number is 1,095,097.09.

11:12   25         THE COURT:  Which means that that's the lesser

1    number, which means -- Airis' argument is that you're not

2    entitled to the $25,700?

3              MR. FAZEL:  The other way around, Your Honor.  The

4    1.1 million, which is WIC's higher amount.  So, we're

11:13    5    actually getting a credit, looking at Airis' ledger.

6              THE COURT:  I'm sorry.  Let's do that again.

7              MR. FAZEL:  Yes, sir.

8              THE COURT:  Which of these is Airis' ledger?

9              MR. FAZEL:  The Airis ledger was 1,095,000.

11:13    10              THE COURT:  Okay.  1,095,000, which makes this on

11    its ledger for less value --

12              MR. FAZEL:  -- than what the government shows.

13              THE COURT:  -- than what the government shows.

14              And Airis would argue -- this is what I was

11:13    15    trying to say -- Airis would argue that you're not entitled

16    to the 25,700?

17              MR. FAZEL:  No.  Because it's Airis' ledger, I

18    don't see how they could argue that.

19              The government's accounting indicates that --

11:13    20              THE COURT:  Well, they're not going to measure

21    against the government.  The government is playing a

22    different role here.

23              You're seeking the difference between

24    1.1 million which the government claims is there and 1.095

11:13    25    which Airis claims is there.

1        MR. FAZEL:  Correct.

2        THE COURT:  And we have to admit that Airis would

3   not be -- if Airis were to give you this $25,000 it would

4   mean their ledger number is lower than it ought to be.

11:14   5   Right?

6        MR. FAZEL:  Correct.

7        THE COURT:  Am I reading that correctly?

8        MR. FAZEL:  In other words, we would have to say --

9   In other words, if the Court does not agree with this

11:14   10   correction, then what we're saying is that Airis' ledger is

11   incorrect and, then, that the Westtree interest calculation

12   is correct.

13        THE COURT:  Well, I'm not saying either is correct.

14        MR. FAZEL:  I know.  I just want to make sure that

11:14   15   the Court understands, if we assume that Airis' ledger is

16   correct, then we're owed a 25-thousand-dollar credit.

17        THE COURT:  Does the government understand that

18   argument?

19        MR. LEWIS:  Yes, Your Honor, I understand the

11:14   20   argument, but the government disagrees with the argument.

21        THE COURT:  All right.  We'll come back to that,

22   then.

23        MR. FAZEL:  Then on -- That was "F", Your Honor,

24   that we discussed.

11:14   25        THE COURT:  Yeah.

1          MR. FAZEL:  "G" is -- there were three payments

2     made by Westtree on behalf of Airis to companies that Airis

3     owed money.  These payments added up to $32,717.38.

4          THE COURT:  What does Airis say?  Mr. West is

11:15  5     keeping the books on both sides of this.  So, is he saying,

6     first, that Westtree has made the payments and, secondly,

7     that the money is owed to Airis or is he saying it's owed to

8     Westtree?

9          MR. FAZEL:  He's saying that the credit was never

11:15  10    provided to --

11         THE COURT:  But how could it not be if he's keeping

12    the books?

13         MR. FAZEL:  Because I don't think Mr. West was

14    keeping all the books.  Mr. West was certainly keeping the

11:15  15    Westtree books.  Mr. West was certainly keeping certain

16    ledgers, but the Airis ledger was being kept by an

17    independent, I would say, accounting firm that I have given

18    the name to the Court.  It's Harshman and Phillips.

19         THE COURT:  Okay.  So, he's claiming a 32,700-plus

11:16  20    credit there for payments made that Airis does or does not

21    recognize?

22         MR. FAZEL:  Your Honor, I don't know the answer to

23    that because there is nothing in the ledgers that would

24    suggest that Airis does or does not recognize it.  We just

11:16  25    know -- by looking at the ledgers and looking at the bank

 1   accounts, we know that these payments were made on behalf of

 2   Airis.

 3              THE COURT:  Okay.  Where is the government on this?

 4   Agree or disagree?

11:16  5              MR. LEWIS:  I'm sorry, Your Honor?

 6              THE COURT:  That 32,700, that's part of your

 7   disagreement?

 8              MR. LEWIS:  Yeah.  We disagree with that, Your

 9   Honor.

11:16  10              THE COURT:  We'll come back to that.

 11                   "H" is the last of the agreed?

 12              MR. FAZEL:  That is the last of the objections.

 13              THE COURT:  Oh.  Objections.  Well, what three did

 14   they agree to?

11:16  15              MR. FAZEL:  I'm sorry.  The three that we agreed to

 16   were "C" on Page 4 --

 17              THE COURT:  All right.

 18              MR. FAZEL:  -- "D" on Page 5 and "E" on Page 5.

 19              THE COURT:  And probation disagrees with "D".

11:17  20              MR. FAZEL:  The probation department disagrees with

 21   "D".  Correct.

 22              THE COURT:  All right.  Let me now return, then,

 23   to --

 24              MR. FAZEL:  "H", which is the last one.

11:17  25              THE COURT:  -- yeah, to "H".

```
 1            MR. FAZEL:  That is simply, Your Honor -- there's
 2   $23,625 of money that is owed to Westtree for work done on
 3   behalf of Airis, which was their standard keeping of the
 4   books and doing what --
11:17  5            THE COURT:  How is this different, then, from "A"?
 6            MR. FAZEL:  Different time period.
 7            THE COURT:  But the same --
 8            MR. FAZEL:  -- type of argument.
 9            THE COURT:  The same argument.  Same basis.
11:17 10            MR. FAZEL:  Yes, Your Honor.
11            THE COURT:  I get it.
12                 And the government disagrees there?
13            MR. LEWIS:  Yes, Your Honor.
14            THE COURT:  Let me move, then, to the government's
11:17 15   response, then, to "A" and "H".  These would be times --
16   argument is being made, I think, that these are credits that
17   should go for work done and time expended.
18                 Any response?
19            MR. LEWIS:  Yes, Your Honor.
11:18 20                 If I could, in responding, I just want to
21   explain from the beginning that, as the Court is aware,
22   Mr. West worked for Westtree first as -- I'm sorry -- worked
23   for Airis first as their internal accountant and bookkeeper.
24   Then he formed Westtree and continued providing accounting
11:18 25   and bookkeeping services to Airis.  This is a tangled web of
```

1    deception and confusion, which is why the numbers are not

2    clear to the Court today.

3             Mr. West, as the Court certainly understands,

4    was preparing the accounting records and books for Airis.

11:18    5    In fact, he prepared more than one set of books.  He

6    prepared false ledgers, false wire statements, false bank

7    records, as part of his scheme to confuse and deceive Airis

8    as well as the outside accounting firm Harshman and Phillips

9    that's been referred to today.  Mr. West provided some of

11:19   10    the raw data to Harshman and Phillips that they relied on in

11    preparing statements for Airis.

12             Because of Mr. West's intentional efforts to

13    deceive not only Airis and, also, Harshman Phillips, but he

14    also deceived -- and this is important, we believe, Your

11:19   15    Honor -- he deceived Ann Dykes.  And Ann Dykes worked for

16    Mr. West.  She did the bookkeeping services for Mr. West.

17    He was her supervisor.  He was the owner of the company.  He

18    oversaw what she did.  And she prepared the bookkeeping

19    records which the government has relied on, after the FBI

11:19   20    interviewed her, and they reviewed the records with her.

21             So, some of the statements that have been made

22    today by defense counsel about statements that are Airis'

23    statements -- it's not true.  These are statements that were

24    prepared by Westtree, by Ms. Dykes.  She prepared these

11:19   25    statements.  In accordance with the instructions she was

1    given by Mr. West, she believed that these money transfers

2    from Airis into the bank accounts of Westtree and other

3    corporations --

4            THE COURT:  You passed up what I was trying to

11:20   5    cover.

6                But I believe the transfers would have been

7    "F".  Right?

8            MR. FAZEL:  The transfers would be "G", actually,

9    Your Honor.

11:20   10           THE COURT:  I'm sorry?

11           MR. FAZEL:  "G".  Those would be the payments that

12   were made on behalf of --

13           THE COURT:  Okay.  Those transfers.

14           MR. FAZEL:  Yes.

11:20   15           THE COURT:  So, let me go back, Mr. Lewis.

16                I think what I am asking is:  Are you

17   saying -- Maybe I should turn it around this way.  Are you

18   saying that there is no way to definitively determine

19   whether the "A" and "H", which I would define as work done

11:20   20   by employees and/or time expended -- 'You owe me because I

21   worked 20 hours,' et cetera, that kind of argument -- Are

22   you arguing or stating that there is no way to verify or

23   that you feel comfortable verifying or the records would not

24   necessarily verify that this work was actually done?

11:21   25           MR. LEWIS:  In part, Your Honor.  I am saying that

1    Mr. West, the Defendant in this case, has not met his burden

2    of supporting those objections with reasonable, adequate and

3    necessary proof to establish that those objections are

4    valid.

11:21  5          What he could have done, which I have seen in

6    other cases, is to hire an outside accountant, an

7    independent accountant or CPA or accounting firm, to review

8    all of these records and provide an independent report to

9    the Court.  Instead, what Mr. West did is he did his own

11:21  10   analysis, and it's because of his misconduct in doing

11   accounting procedures and analyses that brings us here

12   today.

13          So, the Court shouldn't, respectfully, rely

14   upon someone who is not credible in the sense that, but for

11:22  15   the fact that he committed this fraud scheme for a period of

16   seven years -- and it was a complex fraud scheme -- I keep

17   repeating that -- but for the fact that he committed the

18   scheme, we wouldn't be here today.  And he has not met his

19   burden of proof by hiring someone or asking someone, other

11:22  20   than himself, who is qualified to provide an expert opinion

21   or reasonable opinion to the Court to rely upon.

22          And the other point I would like to make, Your

23   Honor, is Westtree provided accounting services and

24   bookkeeping services to other companies, other individuals.

11:22  25   Some of those individuals have filed criminal complaints in

1    the state of Georgia.  So, it wasn't just for Airis.

2              And, certainly, he did provide some services

3    to Airis, but the quality of those services -- Airis didn't

4    get what they bargained for, what they paid for.  Instead,

11:22  5    they were the victim of a fraud where they lost almost

6    $4 million.

7              So, it is hypocritical for Mr. West to say,

8    'Look, Your Honor.  I am going to accept responsibility and

9    take the necessary appropriate punishment from the Court,

11:23  10   but I want to get paid for the work that I am now being

11   sentenced for.'  It doesn't make sense in terms of equity

12   and fairness.  It's not reasonable for Mr. West to make the

13   request without meeting his burden of proof that he's

14   entitled or anyone is entitled.

11:23  15             And he hasn't clearly demonstrated that

16   Westtree has not already been paid.  That's the allegation,

17   but he hasn't proven that allegation.  He doesn't have

18   anything more than an objection.

19             THE COURT:  So, I gather your argument along those

11:23  20   lines would also apply to what are listed here as Items F

21   and G, the $25,700 that you said you disagree with, and the

22   $32,700, which are the allegations -- payments to third

23   parties.

24             MR. LEWIS:  That's correct, Your Honor.

11:24  25             And with respect to Allegation "F" counsel for

1    Mr. West referred to a report that was created for Airis,

2    the Westtree Interest Calculation.  That was not prepared by

3    Airis or for Airis.  It was prepared by Ann Dykes who worked

4    for Mr. West.  She prepared that number.

11:24    5              So, we are relying upon that number because we

6    have looked at the records.  We have interviewed Ms. Dykes.

7    She said that, based upon her years working with Mr. West,

8    that number is accurate; and, therefore, we're relying on

9    it.

11:24    10             And Mr. West --

11             THE COURT:  I think you are referring to Item D,

12    then, aren't you?  Item D is the one you agreed with that

13    probation disagreed with.  That's the 31,000.

14             MR. LEWIS:  Which page, Your Honor?  I was looking

11:24    15   at Page 5.

16             THE COURT:  I'm not sure.  Item D is -- Are you

17    looking at Mr. Fazel's outline?

18             MR. LEWIS:  I am looking at his objections, Your

19    Honor.

11:24    20             THE COURT:  Okay.  I am looking at Page 5, then.

21    On Page 5 I marked Item D, $31,231, as being, as Mr. Fazel

22    says, you agree with --

23             MR. LEWIS:  That's correct.

24             THE COURT:  -- that probation disagreed with.

11:25    25             MR. LEWIS:  I believe probation agreed with that,

```
 1   Your Honor.
 2           THE COURT:  Do you --
 3           MR. LEWIS:  Page 7 --
 4           THE COURT:  I'm not sure it makes him a lot of
 5   difference, but it's --
 6           PROBATION OFFICER:  No, Your Honor.  We adopted the
 7   government's response, but that amount does not impact the
 8   guideline calculations.
 9           THE COURT:  I get it.  I get it.
10           But adopting -- she's saying that you might
11   get the credit, but you don't get any adjustment --
12           MR. LEWIS:  That's correct.
13           THE COURT:  -- in sentence to be imposed.
14           MR. LEWIS:  I wanted to make it clear that the
15   government believes in being fair; and, therefore, based
16   upon our review or responses to the objections we are --
17           THE COURT:  Let me ask it this way.
18           Does that number show up and is it reflected
19   in the probation's or your final calculation as to what
20   the -- Let me just take a look.  I believe that -- Let's
21   make sure we know what we're talking about.
22           I believe the government's -- I'm sorry -- I
23   believe probation's final number is $3,561,166.11.
24           MR. LEWIS:  That's correct, Your Honor.
25           THE COURT:  And you would say that that 31,000
```

 1    should be and is reflected in that calculation?

 2         MR. LEWIS:  Yes, Your Honor.

 3         THE COURT:  All right.  I see a nod from probation.

 4         PROBATION OFFICER:  Yes, Your Honor.  That is my

11:26  5    understanding.

 6         THE COURT:  You're saying that's the understanding.

 7              So, let's move away from that because I think

 8    you were confusing me when I asked you about "G" because "G"

 9    was a three-part payment argued by Mr. Fazel as being

11:26 10   payments made by Westtree, I gather, on behalf of Airis

 11   totaling 32,700.  And probation, I believe, as well as

 12   yourself, say, 'We disagree.'

 13        MR. LEWIS:  That's correct.

 14        THE COURT:  And is the basis -- What my question

11:27 15   was:  Is the basis of your disagreement like or similar to

 16   the argument that you have made for not giving credit for

 17   work and time expended because the books aren't reliable?

 18        MR. LEWIS:  And I apologize for being confusing and

 19   responding, Your Honor.  The answer is:  This is an

11:27 20   additional and different argument.

 21        THE COURT:  Okay.  Go ahead.

 22        MR. LEWIS:  This argument with respect to

 23   Objection G on Page 5 is there is no proof to whom these

 24   payments were made by Dixon West Properties, which was an

11:27 25   entity owned by Westtree.  Mr. West hasn't met his burden of

        1    establishing to whom these payments were made.

        2            THE COURT:  All right.  And that argument, then,

        3    Mr. Fazel -- or response to that is what?

        4            MR. FAZEL:  If it please the Court.  If I can --

11:27   5    May I respond to the issue --

        6            THE COURT:  No.  I want to go to "G" right now --

        7            MR. FAZEL:  Yes, Your Honor.

        8            THE COURT:  -- while it's hot on my mind.

        9            MR. FAZEL:  The argument to that is that, if the

11:28  10    Court was to look at the bank records, you will see the

       11    payments being executed to the respective business entities.

       12    Those are attached as exhibits to my objections as

       13    Exhibit 6.  I don't know how else to prove that these were

       14    on behalf of Airis other than to show the bank records

11:28  15    and/or the general ledgers that show that.

       16            So, I am going to rest on that issue.

       17            THE COURT:  Well, what dates are we looking at?

       18            MR. FAZEL:  If you go to Exhibit 6, Your Honor --

       19            THE COURT:  That three-page document.

11:28  20            MR. FAZEL:  -- yes, Your Honor -- you will see that

       21    there is -- and here's when -- This is the part that the

       22    government will say, 'Well, how do we know what these are?'

       23    And I can understand that, but you can look at Page 6 --

       24    excuse me -- Exhibit 6.  You will see wire transfers for

11:28  25    12-5, 12-5 --

```
 1              THE COURT:  I'm sorry.  Are you giving me dates?
 2              MR. FAZEL:  I'm sorry.  Yes, Your Honor, for 12-5,
 3    December 2005.
 4              THE COURT:  Okay.  In the amount of?
 5              MR. FAZEL:  $5,000.
 6              THE COURT:  Okay.  I see that.
 7              MR. FAZEL:  Right below it, December 2005, for
 8    1,850.
 9              THE COURT:  Right.  I see that.
10              MR. FAZEL:  And then you'll have -- on the next --
11    following page, Your Honor, you have again wire transfers.
12              THE COURT:  So, would it be reflected in what we
13    call the "wire transfers"?  Is that where you were
14    talking --
15              MR. FAZEL:  Correct.  An ACH payment.
16              THE COURT:  -- in ACH payments?
17              MR. FAZEL:  Yes, sir.
18              THE COURT:  All right.  And what you're saying is
19    you concede that the government is going to argue, well, how
20    do we know where that money went and whether or not it was
21    actually owed or whether there's any invoice --
22              MR. FAZEL:  Correct.  And then the response back
23    from me would be, well, you'd have to look at the Airis
24    general ledger that would reflect that.  And then they would
25    say, well, the Airis general ledger was somehow manipulated
```

1   by Mr. --

2           THE COURT:  I get it.

3           MR. FAZEL:  And we're back to the circular

4   argument.

11:29   5           THE COURT:  All right.  Finally, Mr. Lewis, tell me

6   about "F" which is the 25,787.  That's on Page 5.  And

7   Mr. Fazel is arguing that there is a distinction or

8   difference between the certain reports.  We got into that

9   initially, the 1.1 million versus 1.095.

11:30   10          MR. LEWIS:  Yes, Your Honor.  With respect to

11  Item F or Objection F on Page 5, Mr. West, through his

12  counsel, makes the objection that the Westtree calculation

13  report reflecting the 1.12 million amount shouldn't be

14  relied upon or isn't reliable because it was created by the

11:30   15  FBI.  That's what's in writing in the objections.

16              That is not accurate.  It was not created by

17  the FBI.  It was created by Ann Dykes who worked for

18  Mr. West at the instruction of Mr. West.  She kept a running

19  total of the monies that he was taking or stealing from

11:31   20  Airis.

21              Therefore, it is the government's position

22  that that number, the 1.12 million number, is accurate and

23  reliable because it was prepared by the employee of

24  Mr. West, Ann Dykes, who kept track --

11:31   25          THE COURT:  As opposed to the FBI?

1          MR. LEWIS:  Correct.  And that there is no

2     support -- Mr. West has not met his burden of proving that

3     the 1.12-million-dollar number is not reliable and not

4     accurate for the reasons I just stated.

11:31  5          THE COURT:  Well, where does he get the 1.095

6     number from?

7          MR. LEWIS:  I don't know.

8          MR. FAZEL:  If I may address that issue, which is

9     "F".

11:31  10          So, the government takes the position that --

11     and it was -- You're right.  I misspoke or mistyped.  It

12     wasn't created by the FBI, but it was certainly relied on by

13     the FBI.

14          THE COURT:  Yeah.  That's what Mr. Lewis is saying.

11:31  15          MR. FAZEL:  So, what we're saying is, if you look

16     at the Westtree Interest Calculation Report, it indicates

17     the balance amount of $1.1 million as of December 2012.  If

18     you look at the general ledger that's being held by Airis

19     that this man right here has no access to, that shows 1.095.

11:32  20          THE COURT:  Uh-huh.

21          MR. FAZEL:  So, if you -- You would have to then

22     say that he had somehow been able to access the general

23     ledger of Airis to be able to input something.

24          And, as the Court knows, the general ledger

11:32  25     has a debit and a credit.  You just can't manipulate it like

1    that.  There's got to be some sort of -- It just can't be

2    done that way, especially if an accounting firm is looking

3    over your shoulder.

4                So, my point to the Court is that this is a

11:32   5    difference of $25,000 that there is no explanation for other

6    than somebody has a mathematical error here.  That's "F".

7                As far as "A" is concerned, that's even more

8    pointed, if it pleases the Court, because the Airis general

9    ledger is what we're relying on in order to, again,

11:33   10   demonstrate that $69,000 should be credited to Mr. West,

11   because the difference between the two -- Again, what we're

12   relying on is the more conservative number of $107,000, and

13   that's in our Westtree ledger.  If you look at the Airis

14   ledger it's $117,000; it would be more.

11:33   15              So, we believe that $69,182 is also owed to

16   Mr. West.

17              THE COURT:  All right.  I get it.

18              MR. FAZEL:  That's "A".

19              THE COURT:  All right.  Is there anything that any

11:33   20   person -- I got the information -- I got the notice that

21   there was something that someone -- one of your witnesses or

22   a witness could say that would, I guess, lend clarity to

23   some of this.  Is this what that person would be discussing?

24              MR. FAZEL:  No, Your Honor.  That witness would be

11:34   25   talking about restitution and how we plan on making

1    restitution to the folks at Airis.

2         THE COURT:  How can that person make comments about

3    restitution or a person that -- someone else?

4         MR. FAZEL:  I can proffer exactly if the Court

11:34   5    wishes me to do that.

6         THE COURT:  Yeah.  Let me hear what it's going to

7    be.

8         MR. FAZEL:  Mr. "Ret" Gunn.

9         THE COURT:  Spell that.

11:34   10        MR. FAZEL:  Sure.  I'm sorry.  I apologize.  And

11   let me give you his full name for the record.

12             His full name is spelled E-r-r-e-t-t, last

13   name G-u-n-n, and he goes by "Ret", R-e-t, Gunn.

14             Mr. Gunn has been working with Mr. West since

11:34   15   this whole business has occurred and since Mr. West was

16   arrested, indicted, working together in order to help

17   Mr. Gunn's business.  Mr. Gunn is well aware of the

18   circumstances of Mr. West.  He's been in the courtroom.  I

19   have met with him and is aware of what's going on both here

11:35   20   and the cases in Georgia.  He, nevertheless, wants to

21   continue to work with Mr. West because Mr. West has helped

22   him tremendously in his business, in ability to obtain

23   business, in ability to help him with bids and so forth.

24   Mr. Gunn is a contractor.

11:35   25             He will testify to the Court that Mr. Gunn

1    owes Mr. West $150,000 -- a little bit more than that,

2    actually -- that Mr. Gunn expects to have that amount of

3    money in about three weeks.  I thought it important to have

4    that under oath because Mr. Gunn has been attempting to make

11:35    5    payments, and we actually filed a joint motion with the

6    government to create an account to make those payments ahead

7    of sentencing.  But because of business issues that they've

8    had and cash flow issues that they have in the construction

9    business, they haven't been able to do that thus far.  But

11:35    10    they feel very, very confident that that can occur very

11    soon.

12            He will also address upcoming monies that they

13    expect to earn as part of their business venture that

14    Mr. West has helped with and will explain how much of that

11:36    15    money is Mr. West's money and that we would like to put into

16    the registry of the court to pay back Airis as part of the

17    restitution order.

18            THE COURT:  Well, I can take all that -- statements

19    and comments and concerns from you.  I don't think I should

11:36    20    be taking it necessarily under oath.

21            I think if there is an agreement -- certainly,

22    the parties can enter any agreement they want and, under

23    contractual terms, obligate themselves to each other in that

24    way.  But to take a statement to that effect would have no

11:36    25    impact upon the issue of restitution.

1          And I take it, as a good will gesture, that

2     Mr. West has friends or, at least, a friend who is willing

3     to fulfill his obligations to Mr. West and, perhaps, even

4     some future consideration for some other things that may or

11:37   5     may not have been done or that may be done in the future,

6     whatever that might be.  I hear that.

7          MR. FAZEL:  But that's what Mr. Gunn was going to

8     testify to very briefly.  It's more of a friend -- It's more

9     of a working relationship, Your Honor.

11:37  10          THE COURT:  Yeah.  I, generally, will not take

11    testimony from witnesses unless they're victims of the,

12    quote, crime itself.

13          And, so, I am going to give two or three

14    minutes to Mr. Factor, I believe, for him, if he chooses, to

11:37  15    make a statement.  I don't think that his report to the

16    federal government necessarily should be made a part of the

17    record, but certainly if he wants to speak to...

18          He can stand here to the right of Mr. Lewis.

19          Mr. Lewis, if you would put that microphone a

11:37  20    little bit over so that he can speak into that.

21          MR. LEWIS:  Yes, Your Honor.

22          THE COURT:  Certainly, he can speak to that if he

23    chooses to at this time.

24          Beyond that, counsel, I don't take witnesses

11:38  25    for purposes of character and other things.  Those are

1    letters that I receive.

2                What is your name, sir?

3           MR. FACTOR:  My name is Ronald Factor.

4           THE COURT:  All right.  I'm not putting you under

11:38   5    oath.  You're making a statement.  So, go ahead and proceed.

6           MR. FACTOR:  Thank you, Your Honor.

7                It has been five years, three months to this

8    very day since we discovered Nathan West's crime.  It has

9    been a very difficult period of time trying to recover from

11:38   10   that discovery and to recover from the harm that he has

11   caused our business and our employees.

12                Since the time of discovery, my wife and I

13   have liquidated every asset that we own to try to keep the

14   company in business and keep the employees employed.  That

11:38   15   has failed over that period of time.

16                Since the investigation discovered the

17   beginning of his theft and of his crime almost twelve years

18   ago, he inflicted a very slow bleed into the company that

19   has festered into a fatal blow.  We are now down to one

11:39   20   employee.  We had 24.  He affected the lives of those 24

21   employees, many of whom worked without pay for a long period

22   of time because of their devotion, and one of whom, who is

23   here with me, my son, who had worked with the company for

24   18 years, even had to sell his home and his family has

11:39   25   suffered where they are homeless today.  They pulled the

1   children out of private schools simply because of their

2   devotion to the company and, simply, because of this

3   person's crime.

4              And I say to you, Judge, in all respect, that

11:40   5   after being in business for 53 years I have never gone

6   through anything like this in my life.  Now, in my end

7   years, I don't know if I can recover.  I will be 72 years

8   old in a few months.  The task is daunting.  By the grace of

9   God I do not give up.  But because of the actions of this

11:40   10  person he has led our company to a road of commercial and

11  professional perdition, and I hope we recover and I hope

12  this man pays.

13              Thank you, Your Honor.

14         THE COURT:  Thank you, sir.  You may have a seat.

11:41   15  Thank you.

16              All right.  Let me go ahead now and ask you,

17  Mr. Fazel, whether or not -- Beyond these objections that we

18  have addressed to this point, I don't know I saw any other

19  factual errors or other objections that have been raised.

11:41   20       MR. FAZEL:  There were two other objections, if it

21  pleases the Court.  Those would be found on Page 3 of the

22  objections that were filed with the Court, the first

23  being -- objecting to the sophisticated means and the second

24  being acceptance.

11:41   25       THE COURT:  Yeah, I do recall.  I apologize.

1          MR. FAZEL:  If I could work backwards.  As to his

2     acceptance --

3          THE COURT:  I have read these.  I am prepared -- I

4     wanted to discuss the financial side of things because I

11:41  5     wanted to make sure there was a record of the discussion and

6     the exchange and, as well, I wanted to make sure that I

7     understood what you were arguing and asserting and what

8     Mr. Lewis' position is because I recognize that there were

9     some areas that there was no disagreement.

11:42  10          But, as far as the sophisticated method, I

11     believe Mr. Lewis has responded to that in his comments.

12          And then there are certain paragraphs, I

13     believe, or portions of the report -- In Paragraph 28, I

14     believe, you argue that should not be stated or should --

11:42  15     they have an implication that is beyond what the implication

16     should be, I gather.

17          None of these statements, however, in

18     Paragraph 28 would impact the sentence to be imposed.  That

19     is, they do not -- I am saying Paragraph 28.  Paragraph

11:42  20     28 -- I'm not sure if that's the right number.

21          MR. FAZEL:  It is, Your Honor.  28 is the --

22          THE COURT:  Let me just...  28 is the acceptance of

23     responsibility portion.

24          MR. FAZEL:  Correct.

11:43  25          THE COURT:  I will let him address that, but there

1  is no objection to be made.  And to the extent that these

2  represent objections, then the Court is going to overrule

3  those, Paragraphs 23 and 28, your objections to the report

4  in that respect.

11:43      5           Let me turn now to the financial parts of this

6  because I think that this is critical to the Court's

7  consideration.

8           If Mr. West is in a position to supply and did

9  supply financial data to Airis -- whether it was placed on

11:43     10  the books by employees of Airis or whether or not he had

11  control of it does not mean that he didn't have authority to

12  mislead them by the way that he presented that material.

13           And because of that possibility -- you know,

14  you argue that, well, he didn't have control over the books,

11:44     15  but control is not always direct.  It certainly can be

16  indirect and it can be directed by the way we relate and/or

17  present material to people who are charged with the

18  responsibility of maintaining those records.

19           I place great weight in the government's

11:44     20  argument these reports are not sufficiently reliable that I

21  should receive Mr. West's arguments on them because he was

22  the maker of this invention, he invented this crime, and he

23  manipulated both sides of the ledger as he saw fit.

24           And, so, I am going to overrule objections

11:44     25  that have been made to A and B.  I believe C, D and E are

1    sustained on the government's agreement.  F, G and H are

2    overruled.

3              And, on that basis, the Court is going to find

4    that the restitution to be made is $3,561,166.11.  To the

11:45    5    extent that the Court has misstated something, that number

6    is the number that the Court is relying upon and will use as

7    the basis for the sentencing -- for purpose of sentencing in

8    this matter.

9              Let me say one other thing and then we'll go

11:45    10    to allocution.

11             Under the guidelines that have been

12    established by Congress in this matter, the guidelines call

13    for an offense level of 29, Criminal History Category I, and

14    it calls for a range of punishment from 87 to 108 months'

11:46    15    confinement, three-year term of supervised release and a

16    fine, if appropriate, of 15- to $150,000.

17             There is also the argument to be made in

18    allocution as to whether or not the Defendant should be

19    permitted to -- or should receive acceptance of

11:46    20    responsibility, that argument, and we'll hear about that in

21    just a minute.

22             But for purpose of the record, certainly, the

23    argument that the defense is entitled to make, certainly, is

24    based upon the statute that permits the Court to sentence

11:46    25    the Defendant to not more than a 20-year term of

1    confinement, not more than a 250-thousand-dollar fine and

2    not more than a three-year term of supervised release and a

3    one-hundred-dollar special assessment, and the sentencing

4    guideline range sets a range that Congress determines ought

11:47    5    to be considered by the court.

6            Having said that, let's then proceed with

7    allocution.

8            We'll start with you, Mr. Fazel.  We'll hear

9    then from Mr. Lewis and then, finally, we'll hear from your

11:47    10   client.

11       MR. FAZEL:  Thank you, Your Honor.  If it pleases

12   the Court.

13           First, I want to thank the Court for its

14   patience with these cases and the amount of loss and so

11:47    15   forth.

16       THE COURT:  I made an "A" in accounting, but it was

17   not legal accounting.  All right.

18       MR. FAZEL:  I did not.

19           I would like to discuss the issue of amount of

11:47    20   loss and everything that we went into does not mean in any

21   shape or form that Mr. West is before the Court today 'I

22   didn't do this' or that 'I wasn't responsible for my

23   conduct' or that 'I don't appreciate the fact that I stole

24   $3.6 million.'  That's not what we're here today to do.

11:47    25   Those objections and my intent were to possibly demonstrate

1    to the Court that there were discrepancies between the

2    numbers of the books.

3            That all being said, Mr. West has done a lot

4    in order to convince the Court and Mr. Factor that he is

11:48    5    wanting to pay back the restitution amount.

6            Mr. West has engaged in a business activity

7    with Mr. Gunn, who is here, as the Court is aware, and they

8    together have tried their best to put forth monies before

9    this sentencing occurred to show their good faith and desire

11:48    10    to pay back Mr. Factor as much as they can as quickly as

11    they can.

12            Mr. West -- I've interviewed Mr. Gunn, and

13    Mr. West has a plan for restitution that he wants to share

14    with the Court.  I do want the Court to appreciate -- and I

11:48    15    think it does -- the fact that Mr. Gunn is here, the fact

16    that the money is coming and the fact that we're just

17    unfortunate that we don't have the money into the clerk's

18    account yet, but we fully expect that to be there -- at

19    least $155,000 within the next three weeks.

11:49    20            I would like and I have offered Mr. Lewis to

21    have an interview with Mr. Gunn.  Mr. Gunn is more than

22    welcome to talk with the government to reassure the

23    government and enter into whatever documentation that the

24    government seeks in order to make everybody feel better,

11:49    25    that this is a genuine offer of restitution, which I would

1    submit to the Court is unusual because, you know, in these

2    cases that I have been before the Court on many times and

3    the Court has had many times, restitution is something that

4    is not usually found, not usually returned, and I think it

11:49    5    shows a level of commitment on Mr. West's part in wanting to

6    show the Court that he's not just a cold-hearted guy that

7    says, you know, 'I don't care.  I am just going to do my

8    time and I am going to get it over with and they're never

9    going to get a penny out of me.'

11:49    10    The government in their responses made a

11    couple of statements that I would like to address with the

12    Court.

13    The first is the cars at the West drive.  I

14    know that's in their response.

11:49    15    Yes, there are, some people would say,

16    luxurious.  I agree.  There is a Mercedes and a Jaguar.

17    These are each at least ten years old.  They have 250,000

18    miles -- the Mercedes does.  The other one is older.

19    They're not worth very much.

11:50    20    The home that they live in is underwater.

21    Mrs. West, who is here today, Linda West, is

22    here.  There was a lot of people that wanted to come, but

23    for financial reasons they couldn't bring a lot of people.

24    So, Ms. West, Linda West, Mr. West's wife, is here present.

11:50    25    She will be happy -- I will just proffer to

1    you that she is doing everything she can to make sure that

2    they have a home to stay in, but she has done everything she

3    can to also update the Court.  She has provided financial

4    documents from tax records to bank records to everything

11:50  5    that we supplemented the probation department with as soon

6    as I became involved in this case.  It took us a little

7    while to put all that together, but the probation department

8    and the government have a true, full accounting of

9    everything that the Wests own.  And this was done,

11:51  10   obviously, not only for purpose that we have to but, also,

11   to show, again, cooperation with the Court and the probation

12   department, to show that he is genuinely trying to make

13   restitution.

14            There was a comment in the government's

11:51  15   objections about monies being taken from his school.

16            I can just represent to the Court that there

17   is no issue with the school.  The school was fully refunded

18   their money.  Any issues that had occurred have been taken

19   care of.  Ms. West and I had a long conversation and I have

11:51  20   been assured that there simply is no outstanding issue with

21   any school district and the Wests.

22            So, there are two pending indictments in --

23        THE COURT:  Georgia.

24        MR. FAZEL:  -- Georgia.  And what I would like the

11:51  25   Court to understand and appreciate is that I -- I understand

1    that there has to be punishment and consequences for

2    conduct.  There just has to be.  And I appreciate that.

3              The balancing that the Court has to do on a

4    daily basis is how much punishment do we give somebody.

11:52   5              And I wanted to impress upon the Court that

6    even in custody while in Joe Corley he would receive FedEx

7    boxes from Mr. Gunn.  He would do worksheets.  He would do

8    up business proposals.  He would help Mr. Gunn's business in

9    order to be able to earn the money he has so far to be able

11:52  10    to come to court and say, 'I have been able to come up with

11    $150,000.  Now, I don't have it in front of me, but we'll

12    have it soon.'  And I think that's impressive, for a person

13    to be in custody and still working, to demonstrate to the

14    Court that's how devoted he is on restitution.

11:52  15              And, again, Ms. West is here to testify to

16    that.  I am sure her phone bills will testify to that, her

17    FedEx bills will testify to that, that there was a lot of

18    effort put in order to accomplish that.

19              So, I ask the Court to consider that.

11:52  20              The final thing I want to talk to the Court

21    about is the three points for acceptance of responsibility.

22              Mr. West has done one of the dumbest things I

23    have ever seen a defendant do and that is to simply not talk

24    to their probation department about travel.

11:53  25              This was travel that was partially in order to

1    sell assets to help with restitution and, partially, for

2    vacation.  And there was nothing nefarious about it.  It

3    wasn't overseas.  It wasn't, in anything that the Court

4    hasn't seen, that I am sure the Court would have even

11:53   5    granted, had a motion been filed with the Court.

6            I can promise you that he feels just beside

7    himself because of that because it's threatened his ability

8    to get three points for acceptance of responsibility.  But

9    the fact is that he has accepted responsibility in every

11:53   10   element what the guidelines require him to do.  He has

11   worked his butt off to get money for restitution.  He has

12   done everything he can so that he can stand before the

13   Court, somewhat of a head up, and say, 'You know, I have

14   made a mistake, but I'm working on it.'

11:53   15          So, I would request that the Court strongly

16   consider giving him the three points.  It was truly not an

17   obstruction that he committed.  It was foolish.  It was in

18   violation of the order.  I agree with that.

19          Mr. Lewis, with all due respect to Mr. Lewis,

11:54   20   indicates that he lied to probation.  I'm not sure if he did

21   that.  I think he might have not been forthright when was

22   asked, but certainly told them, 'Hey.  I was out of the

23   location where I needed to be.'

24          For all those reasons I would request that the

11:54   25   Court consider giving him the three points and sentencing

1    him to a level of sentence that would allow him to come out

2    fast enough to make restitution, because the ability for him

3    to do that is there.  And, frankly, he's not employable by

4    any other person because of his criminal history, but

11:54    5    Mr. Gunn is willing to give him that opportunity.

6          And Mr. Gunn has impressed upon me that his

7    company has grown by at least 5 to 10 percent per year based

8    on Mr. West's efforts, and that's a lot.  And, so, as income

9    develops and he makes money, Mr. West makes money and,

11:54   10    hopefully, Mr. Factor can get some restitution for what

11    their family has gone through, for which we are deeply

12    apologetic about.

13          So, I would ask the Court to consider a

14    sentence way below the 86 months.  I would ask the Court to

11:55   15    consider something in the 46-month range, which would allow

16    him to, hopefully, work while in custody as best as he can

17    and then come out and continue his efforts to make

18    restitution.

19          THE COURT:  All right.  Mr. Lewis.

11:55   20          MR. LEWIS:  Thank you, Your Honor.

21          I'd like to start, Your Honor, with reading a

22    brief e-mail that Mr. Factor sent to Mr. West on

23    November 9th, 2012, just before the fraud was discovered

24    because this e-mail illustrates many of the issues the Court

11:55   25    has to decide today.

1            Mr. Factor wrote to Mr. West:

2            "Nathan, it is impossible for me to sleep.  I

3   worry over money issues for which I have entrusted such to

4   you.  You have always been faithful and dutiful, but I don't

11:56    5   know where things stand with Airis' monies."

6            Mr. Factor then continues:

7            "Have you been borrowing money from Airis'

8   accounts with the intent of paying it back to us but you

9   haven't?  Are you depleting my funds to cover your debts and

11:56   10   investments?  Are you taking out loans in Airis' name

11   without my knowledge?  Give me a call to clear the air on

12   these issues.  I am worried sick."

13            Mr. West responds -- and this is one of the

14   several false and significant material misrepresentations --

11:56   15   on November the 9th:

16            "Ron, as I have mentioned in my prior e-mail,

17   I have been borrowing money from David and still owe David

18   $22,500, as I explained in that situation.  Airis has

19   approximately $3.5 million in cash currently.  No, I have

11:56   20   not been borrowing money from the Airis accounts.  What you

21   might find is me advancing payments on behalf of Airis from

22   my account and Airis paying me back.  I can't take out loans

23   in Airis' name.  I'm not sure I can do that."

24            That's just one example of Mr. Factor

11:57   25   attempting to get to the truth of the matter and Mr. West

1    continuing, in as late as November of 2012, to deceive Airis

2    and Mr. Factor and the employees of Airis and the vendors of

3    Airis who Mr. West was charged with making payments to pay

4    the bills on behalf of Airis.

11:57   5               As I stated previously, Your Honor, this was a

6    complex fraud scheme by Mr. West where he had two sets of

7    books.  He concealed the fraud from his own employees,

8    including Ms. Dykes, who believed what Mr. West told her.

9    He concealed the fraud from Airis, its employees, its

11:57   10   vendors and from the outside accounting firm that relied

11   upon the raw data from Mr. West and Westtree in providing

12   financial statements to Airis.  Harshman Phillips was the

13   outside accounting firm.  They worked with Mr. West for

14   several years and they believed the numbers that he provided

11:58   15   were real, legitimate numbers.

16               But it's clearly a pattern of fraud and

17   deception, Your Honor, in this case, including as alleged in

18   the indictment -- There are money laundering charges in the

19   indictment where the government alleges that Mr. West took

11:58   20   money from Airis' accounts to pay money back to the Wilson

21   Creek Foundation, the PTA that Mr. West participated in.

22   Mr. West stole money from the PTA, parent-teachers

23   association, the foundation, and he put that money back in

24   their accounts by stealing money from Airis.  That's alleged

11:58   25   in the indictment.

1          He lied to Airis.  He lied to the vendors of

2      Airis.  He lied to the outside accounting firm.  He made

3      false misrepresentations to his own employees.

4          And on this issue of points for credit for

11:58   5      acceptance of responsibility:

6          Certainly, Mr. West has pled "guilty" in this

7      case.  However, he has not obeyed and not complied with the

8      orders of this court, specifically the order setting

9      conditions of release.

11:59  10          As the Court is well aware, Mr. West is

11     currently in custody as a result of a motion that was filed

12     by the government to revoke his bond.

13          March 6th of 2017 the probation officer in the

14     Northern District of Georgia provided a letter to the Court.

11:59  15     In the letter, the probation officer stated that, when he

16     initially contacted Mr. West about his unauthorized travel,

17     Mr. West initially denied having traveled without

18     permission.  He denied that he traveled without the Court's

19     permission.  That's what he told the probation officer.

11:59  20     That's not an example, Your Honor, of someone who has

21     clearly demonstrated acceptance of responsibility.  Not only

22     did he travel without permission when he certainly could

23     have easily filed a motion or his lawyer could have filed a

24     motion asking for permission.  When an officer -- the

12:00  25     probation officer contacted Mr. West and asked him about

1    that travel, he told -- again, he provided a false statement

2    to the probation officer denying that he traveled.  He then

3    later in that conversation admitted that he did travel,

4    requiring the government to file a motion.  There was a

12:00    5    hearing on the motion.  The Court heard the motion and the

6    Court agreed and entered an order revoking his bond.

7             You know, so there was an additional effort,

8    frankly, by the probation office and by the government to

9    ensure that Mr. West would continue to comply with the

12:00   10    orders of the Court.

11             He's clearly not demonstrated an acceptance of

12    responsibility.  And, frankly, he has not helped the

13    government because he has not, in my opinion or the

14    government's opinion, provided truthful information about

12:00   15    restitution because he hasn't paid anything in restitution.

16             As is contained in the PSR, Mr. West is

17    married.  He has three children.  He lives in a one-million-

18    dollar house.  He still lives in that house -- or his family

19    does.  They still own that house.  It's true they may be

12:01   20    behind in the payments, but they still live in that house.

21    His three kids are currently in private school.  We hear

22    from Mr. Factor that one of his employees had to withdraw

23    his children from private school because of what Mr. West

24    did, but his kids continue to be in private school.

12:01   25             He has not taken this matter seriously, Your

1    Honor.  He has made no substantial efforts towards paying

2    restitution, because, although there is an order allowing

3    the clerk to accept payments of restitution prejudgment,

4    there have been no monies whatsoever, not a dime, that's

12:01  5    been paid towards restitution.

6              For these reasons, Your Honor, we respectfully

7    ask that you sentence Mr. West at the high end of the

8    punishment range.

9              THE COURT:  I take that to mean that the plea

12:01 10    agreement that the government had with the defense -- you

11    consider that breached and, therefore, you're not

12    recommending the two-point adjustment.  Not only that, but

13    you're objecting to the additional one point.

14              MR. LEWIS:  Yes, Your Honor.

12:02 15              THE COURT:  So that the record is clear.

16              MR. LEWIS:  That's correct.

17              THE COURT:  There is a statement regarding the

18    exact understanding or agreement.

19              All right.  Mr. West, you may proceed at this

12:02 20    time.  Do you have some statements you want to make to the

21    Court?

22              MR. FAZEL:  Your Honor, may I make just a rebuttal

23    just --

24              THE COURT:  As to which of those?

12:02 25              MR. FAZEL:  As to the breach of the plea agreement

1  and of the private schools.

2          THE COURT:  And -- I'm sorry?

3          MR. FAZEL:  And the private school comment that the

4  government made.

12:02   5          THE COURT:  Well, I think Mr. West can talk to

6  that.  I am sure he's aware of the circumstances --

7          MR. FAZEL:  Yes, sir.

8          THE COURT:  -- personally aware of those

9  circumstances.

12:02  10          Go ahead and proceed, Mr. West.

11          THE DEFENDANT:  Your Honor, I'd like to start with

12  just answering a few questions we talked about here.  I will

13  kind of work my way backwards.

14              As it relates to my three children in private

12:02  15  schools, that is not correct.  My two daughters go to a

16  public high school right across the street from where I

17  live.  My son does go to a private school, but he was moved

18  there due to some learning issues and that is why he is

19  going to school at a private school.

12:03  20              As relates to my conversation with the

21  probation officer, that was a face-to-face conversation in

22  his office where I sat down on the sofa in his office.  He

23  was across the desk and he asked me -- well, he first called

24  me and said, "Hey.  I need to see you first thing today."

12:03  25  And, so, I drove over that morning and met with him.  And he

1    did ask me.  He said, you know, "Mr. West, have you been

2    traveling?"

3                And, you know, I did hesitate and I said,

4    "Well, as a matter of fact, I did go to North Carolina."

12:03   5    And then I told him that I also went to Florida.  And I did

6    tell him that.  He didn't ask about Florida and I told him

7    that.

8                So, I, you know... Anyway, that's the answer

9    to that question.

12:03   10               But going back to the general ledgers and the

11   two sets of books and those conversations, the Westtree

12   general ledger and the Airis general ledger were done by the

13   same people in the office and Ann Dykes was one of those

14   folks.  Those two ledgers had to match because of the fact

12:04   15   the outside accounting firm who did our taxes, who did the

16   reviews, the compilations -- they had to match because of

17   the loans back and forth between Airis and my company.

18               So, when we're talking about Ann Dykes and

19   others, they were the ones keeping the books.  Yes, I was

12:04   20   over them.  The system we had was Viewpoint, an accounting

21   system that I never entered one entry into that system, and

22   the -- Anyway, so just to clarify that, that was that.

23               But, anyway, I'll -- I'd like to say a few

24   things to the Court about myself and my actions that have

12:05   25   occurred.

1    So, Your Honor, thank you for allowing me to

2    have this time to address the Court and the many people who

3    have been affected by my actions.  Many people have been

4    hurt by me and my actions and I appreciate you allowing me

12:05    5    the time to apologize to them.

6    First, I would like to apologize to my family,

7    my children, who I love very much.  They're not here today.

8    Because they are minors they're in school, where they need

9    to be.  They are not here today.  My twin daughters Caroline

12:05    10    and Lauren are 16 and are sophomores in high school, and my

11    son Zachary is 12 and he's in 6th grade.  Thankfully, I have

12    been a part of their lives on a daily basis since their

13    birth, and I do realize that being away from them this past

14    year has been difficult for them and for me.  I have missed

12:05    15    them very much.  I am also very sorry how their lives have

16    been affected by my actions.

17    Next I would like to apologize to my wife

18    Linda.  We have been married for 28 years and she has been

19    very helpful to me this past year.  She's worked many hours

12:06    20    outside of her own job in working with Mr. Fazel, my

21    attorney, and our CPA to deliver the many items the

22    prosecutor and the probation office have requested.  I know

23    it's been hard on her being a single parent while also

24    holding down a full-time job.

12:06    25    To my wife and children and my mother as well

1 as my extended family, I'm sorry for the things that I have

2 done.

3     Next, I would like to apologize to Mr. Factor,

4 the Factor family and the company for stealing from Ron.

12:06 5     The case against me as well as my plea

6 agreement is that I stole 3.6 million from Airis through an

7 embezzlement scheme, and I have accepted the responsibility

8 for this and, again, in front of everyone here, I am truly

9 sorry for this error in my judgment over these years.

12:07 10     From the beginning when I met with the FBI in

11 2014, the two agents who came to my home in Georgia

12 unexpectedly -- I did not turn them away but invited them in

13 and answered all their questions.  In my conversation at the

14 time I took full responsibility for what I had done at that

12:07 15 time.

16     The financials of Airis as well as my company,

17 Westtree, were tracked and monitored not only by Airis/

18 Westtree accounting but were overseen by the external

19 accounting firm who would annually recommend how entries

12:07 20 should be made to our books.

21     I have continued to the best of my ability to

22 work for a construction firm to earn money while I have been

23 incarcerated to go towards restitution.  As one can imagine,

24 working from the BOP can be extremely difficult, especially

12:07 25 in an era when timely responses are needed.

1          I began working with this firm in 2015 as a

2     way to begin the process of making money to pay back the

3     loss amount.  The firm was small, but we had potential of

4     growing as the economy is expanding.  My hope is to continue

12:08   5     to work and grow with this company, as I do believe I can

6     put forth a meaningful plan to pay back my restitution.

7          I am 52 years old and still have many years to

8     work with an economy that continues to grow and especially

9     in the areas of multi-family, senior living and healthcare,

12:08  10     areas that we are currently working in now.  I would expect

11     over the next few years that I can pay back the money owed

12     to Mr. Factor.  We currently have projects in the pipeline

13     that could either cover the amount or allow the company to

14     borrow the money to pay it off sooner.

12:08  15          Your Honor, I appreciate you letting me say

16     all this in court today in hopes that I can repay this loss

17     to Mr. Factor and his family in a timely manner before I

18     grow too old and will not be able to do it.

19          Thank you.

12:08  20          THE COURT:  I have got a couple of questions.

21          Do you own an interest in the Gunn

22     companies --

23          THE DEFENDANT:  No, sir.

24          THE COURT:  -- partnership interest?  Does your

12:08  25     wife own an interest in it?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Do you have an undisclosed interest in

3    it?

4          THE DEFENDANT:  We -- No.  I don't -- Tell me

12:09  5    exactly what you're asking me.

6          THE COURT:  Well, an undisclosed interest would be

7    a handshake.  You and I own this 50-50.  Can't put it on the

8    books because my wife might take it in a divorce or because

9    I might lose it in a criminal proceeding.

12:09  10         THE DEFENDANT:  No, sir.  The agreement we have --

11   and it's in the spreadsheet here -- is that I get a

12   percentage of the revenues of the projects.  So,

13   hypothetically, if a project is a million dollars, I get

14   2 percent of that as a fee.

12:09  15         THE COURT:  So, it's a project-by-project source of

16   income.

17         MR. FAZEL:  It's a construction company, Your

18   Honor.

19         THE COURT:  Yeah.  I get that.  I know a little bit

12:09  20   about construction.  I understand the way that he is

21   suggesting that he is paid.

22              I believe that you acknowledged two, maybe

23   three -- I'm not sure -- two times that you were -- that you

24   traveled outside of the Southern District of Texas.

12:10  25         THE DEFENDANT:  Well --

1          THE COURT:  Was it two or three?

2          THE DEFENDANT:  I live in Georgia and, yes, I have

3     traveled out --

4          THE COURT:  You were living in Georgia, but your

12:10  5     restriction was to whatever that district is in Georgia.

6     Correct?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  All right.  So, you traveled outside of

9     Georgia.  The same difference is out of Houston.  But you

12:10  10    traveled outside of Georgia, outside of that district in

11    Georgia, on two or three occasions?

12         THE DEFENDANT:  On two.

13         THE COURT:  All right.  Once to North Carolina?

14         THE DEFENDANT:  And once to Florida.  But, I mean,

12:10  15    to clarify, I went to Charlotte for a meeting in North

16    Carolina, and then from there I went over to Highlands,

17    North Carolina, which is another location in North Carolina.

18         THE COURT:  Same travel or a different time?

19         THE DEFENDANT:  Same.

12:10  20         THE COURT:  And then you went to Florida on a

21    different occasion?

22         THE DEFENDANT:  Yes.

23         THE COURT:  All right.  And when you were signed up

24    for this bond and release, you were told that you could not

12:11  25    travel without permission not from probation but from me.

1    Right?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Yeah.  So, it's not about probation at

4    all.  It's about your representations or lack of disclosure

12:11    5    to the Court that is a concern to the Court.  You understood

6    that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And you did not disclose to me or to

9    the court that you were travelling or that you desired to

12:11   10    travel.  You agree with that?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  You would certainly appreciate the fact

13    that, whether your intentions were nefarious or not, the

14    fact that you failed to disclose it would lead me, or any

12:12   15    person who seemed to be thinking along the lines of why

16    would you do this, with the idea that there was something

17    nefarious, that you had some personal motivation that you

18    wanted -- that you did not want to disclose, the business of

19    whatever sort was information you did not want to disclose.

12:12   20    Correct?  Wouldn't you think that would be the way that I or

21    some other person might see those ventures?

22              (Mr. Fazel speaks to the Defendant)

23              THE COURT:  Do you understand my question?

24              THE DEFENDANT:  Yes.  Yes, sir.  Yes.  Yes.

12:12   25              THE COURT:  "Yes", you understand the question?

1          THE DEFENDANT:  Yes, sir.  And I am responding

2     "yes" to your question.

3          THE COURT:  Yeah.  So, I would be concerned that,

4     if you're doing something or continuing to do something for

12:12  5     which you have been indicted, whether in federal or state

6     court, that that might be something that I would say, no, I

7     don't want you to travel to North Carolina or to Florida.  I

8     want you to stay where you are and let that fall apart.  You

9     understand that?

12:13  10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Well, you have made something of the

12    idea that the books both at Airis and at Westtree should be

13    in sync.  And my concern is that, when you're taking money

14    out of a company and you are not interested in the persons

12:13  15    knowing what you're doing, you can cover it by some loan

16    document.  You can cover it by some credit at another

17    location.  There are a number of accounting ways that you

18    can go about balancing those books and still -- and actually

19    steal the company blind, aren't there?  And the books are

12:13  20    going to be balanced, aren't they?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Sure.  So, I don't want you to talk

23    about how that can be done.  I am not interested in that.  I

24    am just suggesting that the fact that the books can look the

12:14  25    same, both books are reflecting the same credits, debits or

1    whatever payouts, assets and liabilities -- the fact that

2    they might be similar in their reflection doesn't mean that

3    something nefarious is not going on, does it?

4            THE DEFENDANT:  But in -- in the --

12:14    5            THE COURT:  No.  It doesn't mean that something

6    nefarious is not going on.  Because that's exactly what

7    happened here.  Right?

8            THE DEFENDANT:  Yes.

9            THE COURT:  All right.  You got books that are

12:14   10   showing balancing on both sides and yet something terrible

11   is happening behind the scenes.

12            And, so, when you say that, it doesn't make or

13   register with me as being something that you should be

14   credited with having done, except that suggests to what

12:15   15   Mr. Lewis is suggesting, that there is some sophistication

16   to how you managed to do these books or had them reflected.

17   That's all it really suggests to me.

18            Does it suggest something different to you?

19            (Mr. Fazel speaks to the Defendant)

12:15   20            THE DEFENDANT:  I guess the entries that were made

21   in all the books were actual items that occurred and they

22   were entered properly.  If there was money paid to a vendor

23   or if there was money moved from an account, it was

24   registered.

12:15   25            The general ledgers of the companies show all

1   these transactions that occurred and they do agree to the

2   report that Ann Dykes did prepare.

3            The only difference is the very last one where

4   the general ledgers of the two companies were not exactly

5   the same, because if you take what she did and take both of

6   the general ledgers and go through them, they're exactly the

7   same entries all the way through.

8            THE COURT:  The company was bleeding a number of

9   years even though the books were reflecting that they were

10  in sync.  Right?

11           THE DEFENDANT:  Correct.

12           THE COURT:  So, I'm not so much concerned about the

13  accounting principles and the process that that goes through

14  because different people can agree or disagree about how

15  things should be put on the ledger.

16           But there is no doubt that the company was

17  bleeding.  Correct?

18           THE DEFENDANT:  Correct.

19           THE COURT:  All right.  I don't have much, if

20  anything, to say concerning the question of your payment.

21  Hopefully, you will pay some money to -- pay the

22  restitution.

23           During another life that I had, I represented

24  several construction companies, underground utilities and

25  highway construction and so on, and I understand

1    construction and how monies come and go and don't come and

2    go when you think they're going to come.

3                 Without regard for that and whatever interest

4    that you might have on the books at the Gunn facility or

12:17   5    Gunn companies, it's still within your power to make those

6    determinations.  You would agree with that?  As to whether

7    or not you pay or don't pay.  Right?

8                 THE DEFENDANT:  Yes.

9                 THE COURT:  Right.  And whether or not the Gunn

12:18   10   company pays it to you or pays it to your wife or pays it in

11   trust to your children or any other way that it chooses to

12   do it, it's still -- it's within your power.  And that's not

13   something that I should be concerned about in terms of

14   whether or not you're agreeing to pay, should I?

12:18   15              THE DEFENDANT:  That is correct.  Yes.

16              THE COURT:  All right.  Regarding the restitution

17   amount, I believe I have already stated that it's

18   $3,561,166.11.  And that fund or that amount of money does

19   require the establishment of a separate account, if any

12:18   20   payments are made, but certainly they should be made to --

21   or as directed by the probation officer when and if those

22   funds become available, if they do.

23              MR. FAZEL:  Yes, Your Honor.

24              THE COURT:  I grew up in the country and we had a

12:19   25   term, Mr. West, that we used.  At least, I learned it from

1    my mother.  She said, "Talk is cheap, but it takes money to

2    buy land."  And I think what she meant by that was that she

3    had heard enough stories to know that, until the money is on

4    the line, until the money is on the table, the talk about

12:19    5    money is really good conversation you can have over coffee

6    or tea and a biscuit or something, but it doesn't make any

7    cents -- c-e-n-t-s -- at all.  Right?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Having said that, my concern and

12:19    10    anguish with you had to do with the fact that you, a well

11    educated man, would take such great privilege with the Court

12    and then think life is so simple and you -- being so

13    selfish, that you would put not just your family at risk but

14    other families at risk.

12:20    15             This is the kind of collateral damage that no

16    one can ever imagine and measure because it's just keeps --

17    Kind of like throwing a rock in the pond.  It just keeps

18    reverberating and it goes infinitely to the end of all time.

19    I mean, who can go back and say how much Rome would be worth

12:20    20    if it hadn't burned or whatever figment of our imagination

21    we might rely upon?

22             So, we do great damage to ourselves and to our

23    families and to other families when we engage in fraud and

24    deceit.  And, so, that's something you will have to come to

12:20    25    terms with in your head as well as in your heart, because

1    this conviction has to be downloaded from just simply

2    saying, you know, 'I did something wrong' to a point where

3    there is a conviction that says, 'I didn't just do something

4    wrong.  I've got to do something right,' see, because that's

12:21    5    the other side of the ledger from an accounting perspective.

6                   Pursuant to the Sentencing Reform Act of 1984

7    it's the judgment of the Court that the Defendant, Daniel

8    Nathan West, is hereby committed to the custody of the

9    Bureau of Prisons to be imprisoned for a term of 108 months'

12:21    10    confinement.

11                   Upon release from imprisonment you're placed

12    on supervision for a term of three years.

13                   Within 72 hours of your release you're to

14    report to the person in probation in the district where you

12:21    15    are released within 72 hours.

16                   You're to comply with the terms of supervised

17    release by not committing another federal, state or local

18    crime and complying with the standard conditions of

19    supervised release that have been adopted by this court.

12:21    20    And, in addition, you shall comply with the following:

21                   You're to provide the probation officer with

22    access to any requested financial information and authorize

23    the release of any financial information that the probation

24    officer might ask of you.

12:22    25                   You should not incur new lines of credit, open

1    any additional lines of credit or seek the approval of any

2    lines of credit with anyone without first seeking the

3    approval of the probation officer, who will be in contact

4    with me about these things.

12:22    5              You're prohibited from employment or acting in

6    a fiduciary role or in a role of supervision regarding the

7    finances of some other person, third party, handling of

8    other parties' funds or accounting concerns without first

9    discussing and getting the approval of the probation

12:22   10    officer.

11              You're ordered to pay restitution in the

12    amount of $3,561,166.11, all of that payable as follows:

13    Airis is due $3,061,166.11 and Travelers is due $500,000.

14    That totals the number that I gave earlier.

12:23   15              You're further ordered to pay the defendant --

16    I'm sorry.  You're further ordered to pay the United States

17    a special assessment in the amount of $100.

18              The Court is not going to enter a fine or

19    order you to pay a fine because I think you have -- your cup

12:23   20    runs over.  It's full.  If you pay this restitution you will

21    have done a great deed.  So, therefore, there will be no

22    order by the Court to pay a fine.

23              But I expect that if you do not pay the

24    restitution and I expect that if I learn that you're making

12:23   25    lots of money and that you're nickel-and-diming this

1    circumstance, I will be considering and concerned about

2    whether you should remain out after you have served your

3    time or whether or not you should be sentenced to greater

4    time, because those are conditions of a financial crime that

12:24    5    has been committed, that you live up to your financial

6    obligation.  That is very important to me and to your family

7    as well.

8              Anything else from the government?

9              MR. LEWIS:  Just the United States moves to dismiss

12:24    10    the remaining counts in the indictment, Counts 2 through 12,

11    Your Honor.

12              THE COURT:  2 through 12 inclusive?

13              MR. LEWIS:  Yes, Your Honor.

14              THE COURT:  Hold on just one second.

12:24    15              Let me, I believe, correct the record because

16    I believe Mr. West pled to a criminal information, not the

17    indictment, not Count 1 of the indictment.  Correct?

18              MR. LEWIS:  No.  The indictment, Your Honor.

19              THE COURT:  It was the indictment?

12:25    20              MR. LEWIS:  Yes.  There was a criminal information

21    filed, but then there was an indictment subsequently filed.

22              THE COURT:  All right.  But the plea was to Count 1

23    of the indictment --

24              MR. LEWIS:  Correct.

12:25    25              THE COURT:  -- not Count 1-S.

1          MR. LEWIS:  Correct.

2          THE COURT:  And he did not plead to the criminal

3    information, unless that is consistent and the same as

4    Count 1 of the criminal indictment.  Am I correct?

12:25   5          MR. LEWIS:  It may be consistent.  I do have a copy

6    of the plea agreement, and it specifically refers to he's

7    pleading guilty to Count 1 of the indictment.

8          THE COURT:  Very good.  So, the earlier filed

9    criminal information -- I believe it was filed earlier --

12:25  10    being Cause No. 15-515, which eventually became the criminal

11    indictment number, is one and the same, at least in respect

12    to Count 1 or at least he's pled to Count 1.

13          So, there is no problem with it being

14    inconsistent or having any problem with the information, the

12:26  15    paperwork?

16          MR. LEWIS:  That's correct.

17          THE COURT:  That's what I wanted to make sure.  I

18    apologize for that.  It was brought to my attention.  I want

19    to make sure we accounted for that.

12:26  20          You have 13 days from the date of

21    sentencing --

22          Yes, ma'am.

23          PROBATION OFFICER:  Your Honor, would the Court

24    impose a payment schedule for restitution?

12:26  25          THE COURT:  I think the judgment should be for the

1   full amount.  And you're asking whether or not there should

2   be some payment schedule following that.

3           PROBATION OFFICER:  Yes, Your Honor.

4           THE COURT:  I think I will look at that later on.

12:26   5   I will wait to see if there are any payments made and then

6   bring that to my attention.  So, I defer -- or I will

7   withhold ruling on that at this time.  I am just finding

8   that the judgment in the full amount should be entered at

9   this time.  I'd like to see what the capabilities are, if

12:26   10   any, and what Mr. West is or is not going to do, and then I

11   can determine best whether or not there should be some

12   payment schedule put in place.

13           I know you reserve the right to object to it.

14   You can object, obviously, counsel, to my not putting one in

12:27   15   place at this time, but I don't want to speak to what he

16   should be paying or could pay when I know that he has no

17   income at this point, and that his promise of a payment from

18   other income does not do the Court any good.

19           You know, I am going to reconsider that.  But

12:27   20   let me finish and then I will come back.

21           The judgment -- you have got 13 days from the

22   date of the entry of the judgment to give notice of appeal,

23   if you choose to do so.

24           I want the fact that the plea agreement has

12:28   25   been breached and rescinded by the government to be made a

1      part of the record so that, if there is a basis for appeal,

2      you have understanding specifically what area or areas of

3      concern you might have.  You have the right to do that.

4                      Appointed or paid?

12:28   5            MR. FAZEL:  Appointed, Your Honor.

6             THE COURT:  Appointed counsel follows through with

7      this if you choose to appeal.  Certainly, you can choose to

8      not continue with his service, and the Court would appoint

9      new counsel to represent you on any appeal, assuming that

12:28  10      you choose to go through with it.  For sure, get advice of

11      counsel before you do that so that you might be best

12      informed of these matters.

13                      I said I might -- I think I changed my mind.

14      I am going to take up the --

12:28  15                      Is it your proffer or offer to pay that

16      counsel has related to this court, Mr. West?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Then, here's what the Court is going to

19      do.  The Court is going to order you to pay $150,000 toward

12:29  20      this restitution on or before April 30.  That gives you

21      45 days within which to make that payment.  And following

22      that payment of $150,000 the Court is going to order you to

23      pay from any funds earned while in prison a reasonable

24      amount of not less than 50 percent of any earnings you might

12:29  25      earn while in federal prison and not less than 50 percent of

1    any monies that might be coming your way as it relates to

2    any other projects for which you have your hands in that you

3    are earning through the Gunn company or any other entity,

4    not less than 50 percent of any of those funds throughout

12:30   5    the term of your confinement.

6               Following the term of confinement, the Court

7    is going to set the amount of monthly payment at $3,000 per

8    month until paid.  Not less than $3,000 per month.

9               Do you understand my terms?

12:30   10              PROBATION OFFICER:  Yes, Your Honor.

11              THE COURT:  All right.  Anything else, gentlemen?

12              MR. LEWIS:  No, Your Honor.

13              MR. FAZEL:  Just briefly, Your Honor.

14              I know this is something the BOP does, but I

12:30   15   would ask the Court to consider recommending placement close

16   to -- in Georgia close to his family, obviously, because he

17   has no family or kinship here in Houston.  So, any -- That

18   would be my first request.

19              THE COURT:  I don't object to that -- I do not make

12:30   20   the recommendation because I leave it to BOP to determine,

21   obviously, the front side of the initial incarceration-and-

22   holding part of it.  I am confident, however, that they will

23   at some point make sure that Mr. West is near his family so

24   they might visit with him.  And, of course, as you know and

12:31   25   you have just acknowledged, it is a matter within the

1    discretion of the BOP.

2         MR. FAZEL:  And just for clarity of the record,

3    both my objections to sophisticated means and my three-point

4    objection for acceptance have been overruled by the Court?

12:31    5         THE COURT:  Yes.

6         MR. FAZEL:  Thank you, Your Honor.

7         THE COURT:  Thank you, gentlemen.  You may be

8    excused --

9              I'm sorry.

12:31    10         PROBATION OFFICER:  Your Honor, I have one question

11    about -- when Mr. West is released from custody is that

12    payment to be made immediately or --

13         THE COURT:  30 days.  I'm sorry.

14         PROBATION OFFICER:  30 days?

12:31    15         THE COURT:  Yeah, 30 days from the date of release.

16         PROBATION OFFICER:  Thank you, Your Honor.

17         THE COURT:  I apologize.

18              And for the benefit of the full record, the

19    $3,000 per month begins 30 days after the date of entry.

12:31    20    The hundred-dollar special assessment is due and payable

21    immediately.  The $150,00 is due and payable on or before

22    April 30.  And 50 percent of any earnings that he might make

23    as relates to the projects that he's involved in is to be

24    paid to probation toward this restitution.

12:32    25         MR. FAZEL:  Understood.

```
1              THE COURT:  Thank you, gentlemen.

2              MR. LEWIS:  Thank you, Your Honor.

3              MR. FAZEL:  Thank you.  May I be excused, Your

4    Honor?

5              THE COURT:  You may.

6              MR. FAZEL:  Thank you.

7

8                   COURT REPORTER'S CERTIFICATE

9         I, BRUCE SLAVIN, certify that the foregoing is a

10   correct transcript from the record of proceedings in the

11   above entitled matter, to the best of my ability.

12

13                        s/Bruce Slavin
                          _____
14                        BRUCE SLAVIN, RPR, CMR

15

16

17

18

19

20

21

22

23

24

25
```

12:32